# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PARUS HOLDINGS, INC. | ) |
| Plaintiff, | ) ) ) |
| v. | ) Civ. No. 14-1427-SLR |
| SALLIE MAE BANK and NAVIENT SOLUTIONS, INC., | ) ) ) ) |
| Defendants. | ) |

| | |
|---|---|
| PARUS HOLDINGS, INC. | ) |
| Plaintiff, | ) ) ) |
| v. | ) Civ. No. 14-1428-SLR |
| PNC BANK, NATIONAL ASSOCIATION, | ) ) |
| Defendant. | ) ) ) |

| | |
|---|---|
| PARUS HOLDINGS, INC. | ) |
| Plaintiff, | ) ) ) |
| v. | ) Civ. No. 14-1429-SLR |
| SUNTRUST BANK and SUNTRUST MORTGAGE, INC., | ) ) ) |
| Defendants. | ) |

John G. Day, Esquire and Lauren E. Maguire, Esquire of Ashby & Geddes, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Frank V. Pietrantonio, Esquire, Jonathan G. Graves, Esquire and Nathan K. Cummings, Esquire of Cooley LLP.

John W. Shaw, Esquire and Karen E. Keller, Esquire of Shaw Keller LLP, Wilmington, Delaware. Counsel for Defendants PNC Bank, National Association, SunTrust Bank

and SunTrust Mortgage, Inc. Of Counsel: Lionel M. Lavenue, Esquire of Finnegan, Henderson, Farbow, Garrett & Dunner, LLP.

Richard L. Horwitz, Esquire, David E. Moore, Esquire, and Bindu A. Palapura, Esquire of Potter, Anderson & Corroon LLP, Wilmington, Delaware. Counsel for Defendant Sallie Mae Bank. Of Counsel: Luke K. Pedersen, Esquire of Baker Botts LLP.

Rodger Dallery Smith, II, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware. Counsel for Defendant Navient Solutions, Inc. Of Counsel: Jason W. Cook, Esquire of McGuirewoods LLP.

## MEMORANDUM OPINION

Dated: October 8 , 2015
Wilmington, Delaware

**ROBINSON, District Judge**

## I. INTRODUCTION

On November 21, 2014, plaintiff Parus Holdings, Inc. ("plaintiff") filed patent
infringement actions against defendants PNC Bank, National Association,[1] SunTrust
Bank, SunTrust Mortgage, Inc.,[2] Navient Solutions, Inc., and Sallie Mae Bank[3]
(collectively "defendants") alleging infringement of U.S. Patent Nos. 8,098,600 ("the '600
patent"); 8,843,120 ("the '120 patent"); 8,838,074 ("the '074 patent"); and 8,843,141
("the '141 patent") (collectively "the patents-in-suit"). (D.I. 1) Presently before the court
are defendants' motions to dismiss. (D.I. 8)[4] The court has jurisdiction pursuant to 28
U.S.C. §§ 1331 and 1338(a).

## II. BACKGROUND

Plaintiff Parus Holdings, Inc. is a Delaware corporation having its principal place
of business in Bannockburn, Illinois. Defendant PNC Bank, N.A. is a federally chartered
bank having its principal place of business in Pittsburgh, Pennsylvania. (D.I. 1)
Defendant SunTrust Bank is a bank chartered under the laws of the State of Georgia
with its principal place of business in Atlanta, Georgia. Defendant SunTrust Mortgage,
Inc. is a corporation organized under the laws of the Commonwealth of Virginia with its
principal place of business in Richmond, Virginia.[5] (Civ. No. 14-1429, D.I. 1) Defendant
Sallie Mae Bank is a bank chartered under the laws of the State of Utah having its
principal place of business in Salt Lake City, Utah. Defendant Navient Solutions, Inc.,

---

[1] Civ. No. 14-1428. All references are to this action unless otherwise indicated.
[2] Civ. No. 14-1429.
[3] Civ. No. 14-1427.
[4] Civ. No. 14-1427, D.I. 14; Civ. No. 14-1429, D.I. 10.
[5] SunTrust Mortgage, Inc. is a wholly-owned subsidiary of SunTrust Bank.

formerly known as Sallie Mae, Inc., is a corporation organized under the laws of the State of Delaware with its principal place of business in Newark, Delaware.[6] (Civ. No. 14-1427, D.I. 1)

The patents-in-suit issued from a series of continuation applications based on a common specification.[7] The patents-in-suit are titled "Computer, Internet and Telecommunications Based Network." The '600 patent was filed on February 1, 2010 and issued on January 17, 2012. The '120 patent was filed on January 13, 2012 and issued on September 23, 2014. The '074 patent was filed on March 4, 2013 and issued on September 16, 2014. The '141 patent was filed on July 17, 2013 and issued on September 23, 2014.[8]

## III. STANDARD OF REVIEW

A motion filed under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint's factual allegations. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 545 (internal quotation marks omitted) (interpreting Fed. R. Civ. P. 8(a)). Consistent with the Supreme Court's rulings in

---

[6] Sallie Mae Bank and Sallie Mae, Inc. were subsidiaries of SLM Corp., which recently underwent corporate reorganization to spin off, among other things, its federal education loan servicing business to form Navient Corp. Navient Solutions, Inc., is now a subsidiary of Navient Corp.

[7] All citations are to the '600 patent unless otherwise indicated.

[8] The '600 patent is terminally disclaimed back to its parent, U.S. Patent No. 6,775,264 ("the '264 patent"). The '074, '120, and '141 patents are also disclaimed back to the '264 patent as well as to the '600 patent.

2

*Twombly* and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Third Circuit requires a two-part analysis when reviewing a Rule 12(b)(6) motion. *Edwards v. A.H. Cornell & Son, Inc.*, 610 F.3d 217, 219 (3d Cir. 2010); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). First, a court should separate the factual and legal elements of a claim, accepting the facts and disregarding the legal conclusions. *Fowler*, 578 F.3d. at 210-11. Second, a court should determine whether the remaining well-pled facts sufficiently show that the plaintiff "has a 'plausible claim for relief.'" *Id*. at 211 (quoting *Iqbal*, 556 U.S. at 679). As part of the analysis, a court must accept all well-pleaded factual allegations in the complaint as true, and view them in the light most favorable to the plaintiff. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406 (2002); *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). In this regard, a court may consider the pleadings, public record, orders, exhibits attached to the complaint, and documents incorporated into the complaint by reference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384-85 n.2 (3d Cir. 1994).

The court's determination is not whether the non-moving party "will ultimately prevail" but whether that party is "entitled to offer evidence to support the claims." *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 302 (3d Cir. 2011). This "does not impose a probability requirement at the pleading stage," but instead "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [the necessary element]." *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 556). The court's analysis is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 663-64.

## IV. DISCUSSION

### A. 35 U.S.C. § 101

Section 101 provides that patentable subject matter extends to four broad

categories, including: "new and useful process[es], machine[s], manufacture, or

composition[s] of matter." 35 U.S.C. § 101; *see also Bilski v. Kappos*, 561 U.S. 593,

601 (2010) ("*Bilski II*"); *Diamond v. Chakrabarty*, 447 U.S. 303, 308 (1980). A "process"

is statutorily defined as a "process, art or method, and includes a new use of a known

process, machine manufacture, composition of matter, or material." 35 U.S.C. § 100(b).

The Supreme Court has explained:

> A process is a mode of treatment of certain materials to produce a given
> result. It is an act, or a series of acts, performed upon the subject-matter
> to be transformed and reduced to a different state or thing. If new and
> useful, it is just as patentable as is a piece of machinery. In the language
> of the patent law, it is an art. The machinery pointed out as suitable to
> perform the process may or may not be new or patentable; whilst the
> process itself may be altogether new, and produce an entirely new result.
> The process requires that certain things should be done with certain
> substances, and in a certain order; but the tools to be used in doing this
> may be of secondary consequence.

*Diamond v. Diehr*, 450 U.S. 175, 182-83 (1981) (internal quotations omitted).

The Supreme Court recognizes three "fundamental principle" exceptions to the

Patent Act's subject matter eligibility requirements: "laws of nature, physical

phenomena, and abstract ideas." *Bilski II*, 561 U.S. at 601. In this regard, the Court

has held that "[t]he concepts covered by these exceptions are 'part of the storehouse of

knowledge of all men ... free to all men and reserved exclusively to none.'" *Bilski II*, 561

U.S. at 602 (quoting *Funk Bros. Seed Co. v. Kalo Inoculant Co.*, 333 U.S. 127, 130

(1948)). "[T]he concern that drives this exclusionary principle is one of pre-emption,"

that is, "'that patent law not inhibit further discovery by improperly tying up the future use

of' these building blocks of human ingenuity." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, —

U.S. —, 134 S.Ct. 2347, 2354 (2014) (citing *Bilski II*, 561 U.S. at 611-12 and *Mayo*

*Collaborative Servs.v. Prometheus Labs., Inc.*, 566 U.S. —, 132 S.Ct. 1289, 1301

(2012)).

Although a fundamental principle cannot be patented, the Supreme Court has

held that "an application of a law of nature or mathematical formula to a known structure

or process may well be deserving of patent protection," so long as that application

would not preempt substantially all uses of the fundamental principle. *Bilski II*, 561 U.S.

at 611 (quoting *Diehr*, 450 U.S. at 187) (internal quotations omitted); *In re Bilski*, 545

F.3d 943, 954 (Fed. Cir. 2008) ("*Bilski I*"). The Court has described the

> framework for distinguishing patents that claim laws of nature, natural
> phenomena, and abstract ideas from those that claim patent-eligible
> applications of those concepts. First, we determine whether the claims at
> issue are directed to one of those patent-ineligible concepts. If so, we
> then ask, "[w]hat else is there in the claims before us?" To answer that
> question, we consider the elements of each claim both individually and "as
> an ordered combination" to determine whether the additional elements
> "transform the nature of the claim" into a patent-eligible application. We
> have described step two of this analysis as a search for an "'inventive
> concept'"—i.e., an element or combination of elements that is "sufficient to
> ensure that the patent in practice amounts to significantly more than a
> patent upon the [ineligible concept] itself."

*Alice*, 134 S.Ct. at 2355 (citing *Mayo*, 132 S.Ct. at 1294, 1296-98).[9]

---

[9] The machine-or-transformation test still may provide a "useful clue" in the second step
of the *Alice* framework. *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716 (Fed. Cir.
2014) (citing *Bilski II*, 561 U.S. at 604 and *Bancorp Servs., L.L.C. v. Sun Life Assurance
Co. of Can.*, 687 F.3d 1266, 1278 (Fed. Cir. 2012). A claimed process can be patent-
eligible under § 101 if: "(1) it is tied to a particular machine or apparatus, or (2) it
transforms a particular article into a different state or thing." *Bilski I*, 545 F.3d at 954,
*aff'd on other grounds, Bilski II*, 561 U.S. 593.

"[T]o transform an unpatentable law of nature into a patent-eligible application of such a law, one must do more than simply state the law of nature while adding the words 'apply it.'" *Mayo*, 132 S.Ct. at 1294 (citing *Gottschalk v. Benson*, 409 U.S. 63, 71-72 (1972)) (emphasis omitted). It is insufficient to add steps which "consist of well-understood, routine, conventional activity," if such steps, "when viewed as a whole, add nothing significant beyond the sum of their parts taken separately." *Mayo*, 132 S. Ct. at 1298. "Purely 'conventional or obvious' '[pre]-solution activity' is normally not sufficient to transform an unpatentable law of nature into a patent-eligible application of such a law." *Id.* (citations omitted). Also, the "prohibition against patenting abstract ideas 'cannot be circumvented by attempting to limit the use of the formula to a particular technological environment' or adding 'insignificant post-solution activity.'" *Bilski II*, 561 U.S. at 610-11 (citation omitted). For instance, the "mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 134 S.Ct. at 2358. "Given the ubiquity of computers, wholly generic computer implementation is not generally the sort of 'additional featur[e]' that provides any 'practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself.'" *Id.* (citations omitted).

Because computer software comprises a set of instructions,[10] the first step of *Alice* is, for the most part, a given; i.e., computer-implemented patents generally involve abstract ideas. The more difficult part of the analysis is subsumed in the second step of the *Alice* analysis, that is, determining whether the claims "merely recite the

---

[10] Or, to put it another way, software generally comprises a method "of organizing human activity." *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1367-68 (Fed. Cir. 2015) (citing *Alice*, 134 S.Ct. 2351-52, and *Bilski II*, 561 U.S. at 599).

performance of some business practice known from the pre-Internet world along with
the requirement to perform it on the Internet," or whether the claims are directed to "a
problem specifically arising in the realm of computer technology" and the claimed
solution specifies how computer technology should be manipulated to overcome the
problem. *DDR Holdings, LLC v. Hotels.Com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir.
2014).

In *DDR*, for example, the claims at issue involved computer technology directed
at retaining website visitors.[11] In its analysis, the Federal Circuit rejected the notion that
the pre-Internet analog to the claims at issue ended the inquiry, explaining that while

---

[11] In *DDR*, representative claim 19 of the '399 patent recites:

A system useful in an outsource provider serving web pages offering
commercial opportunities, the system comprising:
  (a) a computer store containing data, for each of a plurality of first web
pages, defining a plurality of visually perceptible elements, which visually
perceptible elements correspond to the plurality of first web pages;
   (i) wherein each of the first web pages belongs to one of a plurality of
web page owners;
   (ii) wherein each of the first web pages displays at least one active link
associated with a commerce object associated with a buying opportunity
of a selected one of a plurality of merchants; and
   (iii) wherein the selected merchant, the out-source provider, and the
owner of the first web page displaying the associated link are each third
parties with respect to one other;
  (b) a computer server at the outsource provider, which **computer server**
is coupled to the computer store and **programmed to**:
   (i) receive from the web browser of a computer user a signal indicating
activation of one of the links displayed by one of the first web pages;
   (ii) automatically identify as the source page the one of the first web
pages on which the link has been activated;
   (iii) in response to identification of the source page, automatically
retrieve the stored data corresponding to the source page; and
   (iv) using the data retrieved, automatically generate and transmit to the
web browser a second web page that displays:
     (A) information associated with the commerce object associated with
the link that has been activated, and

7

the "store within a store" concept . . . may have been well-known by the relevant time frame, that practice did not have to account for the ephemeral nature of an Internet "location" or the near-instantaneous transport between these locations made possible by standard Internet communication protocols, which introduces a problem that does not arise in the "brick and mortar" context.

773 F.3d at 1258. In other words, "[a]lthough the claims address[ed] a business

challenge . . ., it [was] a challenge particular to the Internet." *Id.* at 1257. The Court

concluded that, under any of the characterizations of the abstract idea, the claims

satisfied step two of *Alice* as being

different enough in substance from those in *Ultramercial* because they do not broadly and generically claim "use of the Internet" to perform an abstract business practice (with insignificant added activity). Unlike the claims in *Ultramercial*, the claims at issue here specify how interactions with the Internet are manipulated to yield a desired result – a result that overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink. . . .

In sum, [U.S. Patent No. 7,818,399]'s claims are unlike the claims in *Alice*, *Ultramercial*, *buySAFE*, *Accenture*, and *Bancorp* that were found to be "directed to" little more than an abstract concept. To be sure, the '399 patent's claims do not recite an invention as technologically complex as an improved, particularized method of digital data compression. But nor do they recite a commonplace business method aimed at processing business information, applying a known business process to the particular technological environment of the Internet, or creating or altering contractual relations using generic computer functions and conventional network operation, such as the claims in *Alice*, *Ultramercial*, *buySAFE*, *Accenture*, and *Bancorp*.

*Id.* at 1258-59 (citing *Alice*, 134 S.Ct. at 2359; *Ultramercial*, 772 F.3d 709, 714-16 (Fed.

Cir. 2014); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014);

*Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1344-45

---

(B) the plurality of visually perceptible elements visually corresponding to the source page.

773 F.3d at 1249-50 (emphasis added).

(Fed. Cir. 2013); *Bancorp*, 687 F.3d at 1277-78); *but see Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1331-35 (Fed. Cir. 2012).

In *DDR*, the analytical framework (in the context of computer-implemented inventions) was articulated so as to require that the inventive concept "recite a specific way" to solve a "particular Internet-centric problem," with the claimed solution being "necessarily rooted in computer technology," so that the result "is not merely the routine or conventional use of the Internet." 773 F.3d at 1257, 1259. Since providing that explanation, the Federal Circuit has not preserved the validity of any other computer-implemented invention under § 101.[12] For instance, in *Intellectual Ventures*, a case that also presented claims directed at websites,[13] the Court explained that, "[a]t step one of the *Alice* framework, it is often useful to determine the breadth of the claims in order to determine whether the claims extend to cover a "'fundamental . . . practice long prevalent in our system.'" *Intellectual Ventures*, 792 F.3d at 1369 (citing *Alice*, 134 S.

---

[12] *See, e.g., Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343 (Fed. Cir. 2014); *Allvoice Devs. US, LLC v. Microsoft Corp.*, Civ. No. 2014-1258, 2015 WL 2445055, — Fed. Appx. — (Fed. Cir. 2015); *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359 (Fed. Cir. 2015); *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343 (Fed. Cir. 2015); *Intellectual Ventures*, 792 F.3d 1363; *Versata Dev. Grp., Inc. v. SAP America, Inc.*, 793 F.3d 1306 (Fed. Cir. 2015).
[13] Representative claim 1 of U.S. Patent No. 7,603,382 recites:

A system for providing web pages accessed from a web site in a manner
which presents the web pages tailored to an individual user, comprising:
    an interactive interface configured to provide dynamic web site
navigation data to the user, the interactive interface comprising:
    a display depicting portions of the web site visited by the user as a
function of the web site navigation data; and
    a display depicting portions of the web site visited by the user as a
function of the user's personal characteristics.

*Intellectual Ventures*, 792 F.3d at 1368.

9

Ct. at 2356). The Court characterized the claims at issue as relating to "customizing information based on (1) information known about the user and (2) navigation data." *Id.* Likening "[t]his sort of information tailoring" to "providing different newspaper inserts based upon the location of the individual," *id.*, the Court concluded that the first aspect of the inventive concept was an abstract idea. The second aspect of the inventive concept, using "navigation data (i.e., information relating to when the user navigated to the website) to 'customize' the website," *id.*, the Court again concluded that "[t]ailoring information based[, e.g.,] on the time of day of viewing is also an abstract, overly broad concept long-practiced in our society." *Id.* at 1370.[14]

Turning to the second step of *Alice*, the *Intellectual Ventures* Court concluded that the claims at issue presented no inventive concept "that would support patent eligibility."[15] *Id.* at 1370. The Federal Circuit explained:

Steps that do nothing more than spell out what it means to "apply it on a computer" cannot confer patentability. . . . Requiring the use of a "software" "brain" "tasked with tailoring information and providing it to the

---

[14] In this regard, the observation made by the district court in *Paone v. Broadcom Corp.*, Civ. No. 15-0596, 2015 WL 4988279 (E.D.N.Y. Aug. 19, 2015), is worth noting, that (in the context of encryption technology) it was of

no moment that "[e]ncryption, in general, represents a basic building block of human ingenuity that has been used for hundreds, if not thousands, of years." That is because [U.S. Patent No. 6,259,789] does not claim a process that can or does involve the encryption of data for some purpose that is otherwise abstract. Rather, it claims a specific method of doing so.

*Id.* at *7 (citation omitted) (emphasis omitted).

[15] Despite the "dynamic presentation of data – that is, . . . the claimed invention in 'real time' customizes the web page based on the information it knows about the particular viewer" – and despite the claimed "interactive interface," which was "broadly construed by the district court to mean 'a selectively tailored medium by which a web site user communicates with a web site information provider.'" *Intellectual Ventures*, 792 F.3d at 1369-70.

10

user" provides no additional limitation beyond applying an abstract idea, restricted to the Internet, on a generic computer.

*Id.* at 1370-71. In distinguishing *DDR*, the *Intellectual Ventures* Court offered the

following analysis:

> The patent at issue in [*DDR*] dealt with a problem unique to the Internet: Internet users visiting one web site might be interested in viewing products sold on a different web site, but the owners of the first web site did not want to constantly redirect users away from their web site to a different web site. . . . The claimed solution used a series of steps that created a hybrid web page incorporating "look and feel" elements from the host web site with commerce objects from the third-party web site. . . . The patent at issue in *DDR* provided an Internet-based solution to solve a problem unique to the Internet that (1) did not foreclose other ways of solving the problem, and (2) recited a specific series of steps that resulted in a departure from the routine and conventional sequences of events after the click of a hyperlink advertisement. . . . The patent claims [in *Intellectual Ventures*] do not address problems unique to the Internet, so *DDR* has no applicability.[16]

*Id.* at 1371 (citations omitted).

In reviewing post-*Alice* cases such as *DDR* and *Intellectual Ventures*, the court is

struck by the evolution of the § 101 jurisprudence, from the complete rejection of

patentability for computer programs[17] to the almost complete acceptance of such,[18] to

the current (apparent) requirements that the patent claims in suit (1) disclose a problem

"necessarily rooted in computer technology," and (2) claim a solution that (a) not only

departs from the "routine and conventional" use of the technology, but (b) is sufficiently

---

[16] But recall the "store within a store" pre-Internet analog rejected in *DDR*.
[17] *See, e.g.*, 33 Fed. Reg. 15581, 15609-10 (1968), and Justice Steven's dissent in *Diehr*, whose solution was to declare all computer-based programming unpatentable, 450 U.S. at 219.
[18] *State Street Bank & Trust Co. v. Signature Fin. Group, Inc.*, 149 F.3d 1368 (Fed. Cir. 1998), *abrogated by Bilski I*, in which "a computer-implemented invention was considered patent-eligible so long as it produced a 'useful, concrete and tangible result.'" *DDR*, 773 F.3d at 1255 (citing *State Street Bank*, 149 F.3d at 1373).

specific so as to negate the risk of pre-emption. See DDR, 773 F.3d at 1257;

Intellectual Ventures, 792 F.3d at 1371. In other words, even though most of the patent

claims now being challenged under § 101 would have survived such challenges if

mounted at the time of issuance, these claims are now in jeopardy under the

heightened specificity required by the Federal Circuit post-Alice. Moreover, it is less

than clear how a § 101 inquiry that is focused through the lens of specificity can be

harmonized with the roles given to other aspects of the patent law (such as enablement

under § 112 and non-obviousness under § 103),[19] especially in light of the Federal

Circuit's past characterization of § 101 eligibility as a "coarse" gauge of the suitability of

broad subject matter categories for patent protection. Research Corp. Techs., Inc. v.

Microsoft Corp., 627 F.3d 859, 869 (Fed. Cir. 2010). Given the evolving state of the

law, the § 101 analysis should be, and is, a difficult exercise.[20] At their broadest, the

various decisions of the Federal Circuit[21] would likely ring the death-knell for patent

---

[19] Indeed, Judge Plager, in his dissent in Dealertrack, suggested that,

> as a matter of efficient judicial process I object to and dissent from that
> part of the opinion regarding the '427 patent and its validity under § 101,
> the section of the Patent Act that describes what is patentable subject
> matter. I believe that this court should exercise its inherent power to
> control the processes of litigation . . ., and insist that litigants, and trial
> courts, initially address patent invalidity issues in infringement suits in
> terms of the defenses provided in the statute: "conditions of patentability,"
> specifically §§ 102 and 103, and in addition §§ 112 and 251, and not foray
> into the jurisprudential morass of § 101 unless absolutely necessary.

Dealertrack, 674 F.3d at 1335. But see CLS Bank Int'l v. Alice Corp. Pty., 717 F.3d
1269, 1277 (Fed. Cir. 2013), aff'd, 134 S. Ct. 2347 (2014).
[20] And, therefore, not an exercise that lends itself to, e.g., shifting fees pursuant to 35
U.S.C. § 285.
[21] See, e.g., Dealertrack, where the claim was about as specific as that examined in
DDR, yet the Federal Circuit found the patent deficient because it did "not specify how
the computer hardware and database [were] **specially programmed** to perform the

12

protection of computer-implemented inventions,[22] a result not clearly mandated (at least

not yet). On the other hand, to recognize and articulate the requisite degree of

specificity - either in the equipment used[23] or the steps claimed[24] - that transforms an

abstract idea into patent-eligible subject matter is a challenging task. In trying to sort

through the various iterations of the § 101 standard, the court looks to *DDR* as a

benchmark; i.e., the claims (informed by the specification) must describe a problem and

solution rooted in computer technology, and the solution must be (1) specific enough to

preclude the risk of pre-emption, and (2) innovative enough to "override the routine and

conventional" use of the computer. *DDR*, 773 F.3d at 1258-59. The pre-emption

concern is generally amenable to review in the context of a motion to dismiss or for

judgment on the pleadings. The second requirement, which may well involve issues of

fact relating to the state of the art in the technological environment involved, is more

appropriately addressed after discovery in the context of a motion for summary

judgment.

## B. Claim Construction

---

steps claimed in the patent," 674 F.3d at 1333-34 (emphasis added). The disclosure of
such programming details would likely nullify the ability of a patentee to enforce the
patent, given the ease with which software can be tweaked and still perform the desired
function.

[22] Ironically so, given the national concerns about piracy of American intellectual
property.

[23] *See, e.g., SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319 (Fed. Cir. 2010), a
case where the Federal Circuit found that a GPS receiver was "integral" to the claims at
issue. The Court emphasized that a machine will only "impose a meaningful limit on the
scope of a claim [when it plays] a significant part in permitting the claimed method to be
performed, rather than function solely as an obvious mechanism for permitting a
solution to be achieved more quickly, i.e., through the utilization of a computer for
performing calculations." *Id.* at 1333.

[24] *See, e.g., DDR*, 773 F.3d at 1257-58; *TQP Dev., LLC v. Intuit Inc.*, Civ. No. 12-180,
2014 WL 651935 (E.D. Tex. Feb. 19, 2014); *Paone*, 2015 WL 4988279.

The Federal Circuit has "never set forth a bright line rule requiring district courts

to construe claims before determining subject matter eligibility." *Ultramercial, LLC v.*

*Hulu, LLC*, 657 F.3d 1323, 1325 (Fed. Cir. 2011), vacated sub nom. *WildTangent*, 132

S.Ct. 2431 (2012). Given the gate-keeping nature of § 101, "claim construction may not

always be necessary for a § 101 analysis." *Ultramercial*, 657 F.3d at 1325 (citing *Bilski*

*II*, 561 U.S. at 611 (finding subject matter ineligible for patent protection without claim

construction)). In *Bancorp*, the Federal Circuit reiterated that "claim construction is not

an inviolable prerequisite to a validity determination under § 101," but it may be

"desirable—and often necessary—to resolve claim construction disputes prior to a §

101 analysis, for the determination of patent eligibility requires a full understanding of

the basic character of the claimed subject matter." *Bancorp*, 687 F.3d at 1273-74. In

advocating for judicial efficiency, the Federal Circuit recently stated:

> From a practical perspective, addressing section 101 at the outset of
> litigation will have a number of salutary effects. First, it will conserve
> scarce judicial resources. Failure to recite statutory subject matter is the
> sort of "basic deficiency," that can, and should, "be exposed at the point of
> minimum expenditure of time and money by the parties and the court,"
> *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 . . . (2007) (citations and
> internal quotation marks omitted). Here, for example, the district court
> properly invoked section 101 to dismiss Ultramercial's infringement suit on
> the pleadings. No formal claim construction was required because the
> asserted claims disclosed no more than "an abstract idea garnished with
> accessories" and there was no "reasonable construction that would bring
> [them] within patentable subject matter." *Ultramercial, LLC v. Hulu, LLC*,
> No. 09–CV–6918, 2010 WL 3360098, at *6 (C.D. Cal. Aug. 13, 2010).

*Ultramercial*, 772 F.3d at 718-19.

Plaintiff argues that "key claim elements . . . have yet to be construed." (D.I. 13

at 19) Specifically, plaintiff states that

> the scope of the terms "voice server" ('600 patent, claims 1, 5, and 9),
> "speaker-independent" (all claims of the '120, '141, and '074 patents),

14

"speech recognition" (all claims), and "natural" speech and voice (all claims of the '120, '141, and '074 patents) **may** be vital to determining whether these limitations provide a meaningful limitation on the scope of the claims as a whole.

(*Id.*) (emphasis added) Plaintiff also argues that "[i]f it is not otherwise clear on its face, claim construction would be required to determine whether the claims cover the messaging unification." (*Id.* at 20) Plaintiff, however, does not proffer a construction which would affect the analysis of patent eligibility. Plaintiff's arguments below focus on the broader concepts of the claims and the computer components used to argue for patent eligibility. The court concludes that it may proceed to the § 101 analysis.

## C. The Patents

The present invention is a network system, which is based on [I]nternet, computing and telecommunications standards, utilizing computer and [I]nternet technology, an innovative graphical user interface, integrated communication applications and interactive voice recognition technology. The present invention is a unified messaging service which will be accessible from any standard communication device (telephone, computer or [I]nternet), and will give the user intuitive voice command of personal, professional and public information.

(2:14-24) The invention is directed to "[s]mall office, home office professionals, most of whom do not have access to dedicated information management systems or the benefit of administrative support staff . . . ." (2:37-40) "The unified messaging service . . . offer[s] a single point of access to all communications, integrated with personal information management tools and customized public content delivery." (2:32-37) The invention utilizes two separate sites with "a cluster of servers" (voice servers, mirrored Sybase database servers and web servers). The computers used "are 200 MHz Intel-based 19" rackmount servers running a combination of Solaris and SCO UNIX operating systems." The voice server "includes certain functions, such as telephony,

15

automatic speech recognition, text-to-speech, conferencing, etc. Subscribers are

connected to these clusters by either normal telephone connections or by [I]nternet

connections." (3:10-25) The invention "is a compilation of hardware and software" for

voice and fax processing. (5:49-67) "The system combines state-of-the-art speech

recognition, computer and telephony technology." (6:1-2) The system provides three

ways to handle communications: "voice recognition software using natural voice

recognition (phonemes based), not pattern based as many of the current systems

utilize;" "standard telephone touchtones;" or a secure web site accessed via the

Internet. (4:54-61)

Claim 1 of the '600 patent recites:

A computer and telecommunications network for receiving, sending and
managing information from a subscriber to the network and from the
network to a subscriber comprising:
 at least one cluster, said cluster containing at least one voice server,
said voice server containing telephony, speech recognition, text-to-speech
and conferencing functions, such that said subscriber can access said
cluster by a standard telephone connection or by a[n] [I]nternet
connection;
 at least one database server, said database server being connected to
said cluster and containing contact lists and administrative data, such that
said subscriber can manipulate and manage said data;
 at least one file server, said file server being connected to said cluster; and
and
 a web server, said web server being connected to said cluster such that
said subscriber can access said network by connecting to said web server
via the [I]nternet;
 wherein said network can receive a message from said telephone
connection or said [I]nternet connection and transmit said message to said
subscriber by said telephone or [I]nternet connection, and said network
can receive a message from said subscriber by telephone connection or
[I]nternet connection and transmit said message by telephone connection
or said [I]nternet connection based on commands received from said
subscriber.

(7:45-8:3) Claim 5 recites:

A method for receiving, sending and managing information between a computer and telecommunications network and a subscriber comprising the steps of:

   providing at least one cluster, said cluster containing at least one voice server, said voice server containing telephony, speech recognition, text-to-speech and conferencing functions, such that said subscriber can access said cluster by a standard telephone connection or by a[n] [I]nternet connection;

   providing at least one database server, said database server being connected to said cluster and containing contact lists and administrative data, such that said subscriber can manipulate and manage said data;

   providing at least one file server, said file server being connected to said cluster; and

   providing a web server, said web server being connected to said cluster such that said subscriber can access said network by connecting to said web server via the [I]nternet;

   receiving a message from said telephone connection or said [I]nternet connection transmitting said message to said subscriber by said telephone or [I]nternet connection, based on commands received by the network from said subscriber.

(8:17-40)

## D. Analysis

Applying the analytical framework of *Alice*, the court first "determine[s] whether the claims at issue are directed to one of those patent-ineligible concepts," namely, laws of nature, natural phenomena, and abstract ideas. 134 S.Ct. at 2354-55. Defendants contend that independent claim 1 of the '600 patent is representative in concept of all 86 claims[25] of the patents-in-suit. Defendants characterize the claims of the patents-in-suit as "the use of general purpose computers and computer-related components to automate tasks routinely and conventionally performed by humans in a business setting," i.e., a way to automate (using a telephone or Internet connection) conventional tasks performed by an administrative assistant. (D.I. 9 at 1) Plaintiff argues that the

[25] Which include 7 independent claims.

17

patents-in-suit "are directed to unifying different types of electronic voice and data communication systems, and allowing users to operate the systems through natural speech recognition and commands." (D.I. 13 at 9)

The claim language (which does not recite a unification theory) calls for using a "computer and telecommunications network for receiving, sending and managing information from a subscriber to the network and from the network to a subscriber." Specifically, as described by defendants, the claim focuses on the automated tasks of (1) receiving messages via a phone or Internet connection and then transmitting those messages to a subscriber by phone or Internet; and (2) receiving a message from a subscriber by phone or Internet and then forwarding that message based on rules established by the subscriber.[26] (D.I. 9 at 5) Although at the time of issuance the challenges addressed by the patents-in-suit undoubtedly were considered to be Internet-centric, under the current analytical paradigm (i.e., in hindsight), the fact that there are pre-Internet analogs to the patent claims suggests methods of organizing human (business) activity and, therefore, an abstract idea. *See, e.g., Intellectual Ventures,* 792 F.3d at 1368 (finding that the claims of the patent-in-suit were directed to the abstract idea of "tracking financial transactions to determine whether they exceed a pre-set spending limit (i.e., budgeting)"); *Accenture*, 728 F.3d at 1339, 1344 (determining that the patent claims were directed to the abstract concept of "generating tasks to be performed in an insurance organization").

_____

[26] Defendants also provided a hypothetical illustrating a human's performance of the abstract idea. (D.I. 9 at 10-11)

Turning to step two of the *Alice* framework, the specification explains that the "present invention is a compilation of hardware and software" and lists the hardware and software components used to automate the processes routinely performed by administrative assistants. (5:48-67) Focusing on the claim language,[27] defendants identify the following elements: (1) information being sent and received between a user (subscriber) and a "computer and telecommunications network," via standard Internet protocols and/or standard DTMF dial tone lines; (2) generic computer components – a "voice server," "file server," "database server," and a "web server;" and (3) communications being received, transmitted, and organized "based on commands" from the user. (D.I. 9 at 14) Defendants argue that the sending and receiving of information on a "computer and telecommunications network" and the use of generic computer

---

[27] Plaintiff disagrees with the characterization of claim 1 of the '600 patent as representative, pointing out the differences in "speech recognition limitations" of each independent claim 1 of the patents-in-suit: Claim 1 of the '074 patent claims "natural speech input" and "speaker-independent speech recognition;" claim 1 of the '120 patent claims "natural voice spoken commands" and "speaker independent speech recognition;" claim 1 of the '141 patent claims "natural speech command" and "speaker independent speech recognition;" and, claim 1 of the '600 patent claims "speech recognition." Plaintiff concludes that claim 1 of the '600 patent "must be presumed to differ in meaning and scope." (D.I. 13 at 7-8) Comparing claim 1 of the '074 patent – which recites in part "[a] method for managing user-related communications by a voice-enabled system driven by natural voice commands received from users, involving the user-related communications including at least a telephone call, a facsimile message, an e-mail message and a message containing data" – to claim 1 of the '600 patent reveals that claim 1 of the '074 patent is similarly directed to a method of managing communications (albeit using "natural speech input") via telephone and Internet connections. As plaintiff contends, the "speech recognition limitation" in claim 1 of the '600 patent is broader than the corresponding limitations of each independent claim 1 of the patents-in-suit; nevertheless, such differences do not change the overall concept of the patent claims. The court concludes that claim 1 of the '600 patent is representative. *See, Content Extraction*, 776 F.3d at 1348 (agreeing with the district court that certain claims were "representative, because all the claims are 'substantially similar and linked to the same abstract idea.'").

components comprise "generic computer" implementation of the claims. Moreover, the computer components are used for their basic functions and, therefore, do not confer inventiveness. (*Id*. at 14-15)

Plaintiff responds that the patents-in-suit nevertheless satisfy the second prong of the *Alice* test as: (1) they solve problems that specifically arise in communications technologies;[28] (2) the claims rely on specialized components and hardware; and (3) the method claims satisfy the machine-or-transformation test. (D.I. 13 at 12) Plaintiff focuses on the "unification of networks to enable the system to seamlessly communicate messages in any format to a user in any other preferred format." (*Id*. at 13) Plaintiff explains that "a business or system administrator no longer needs to purchase and maintain multiple separate systems (e.g., fax machines, answering machines, pagers, office phones, phone conferencing, e-mail system, etc.)," but instead "can install one unified messaging system with 'integrated telecommunications applications and interactive voice recognition technology.'" (*Id*. at 14 (citing the '600 patent, 1:19-20; 2:18-20; 2:32-33; 2:67-3:1; 3:4-6)) As to specialized components, plaintiff argues that the speech recognition functions "use speaker-independent, phoneme-based, natural voice recognition that does not require the system to be trained before recognizing speech," which are "not functions of a generic computer or general purpose computer components."[29] (*Id*. at 16-17)

---

[28] Plaintiff alleges that the patents-in-suit "address technological problems that were in their infancy in the mid-1990s when the inventions were developed, and that arose from differing communications architectures, protocols, networks, and devices." (*Id*. at 12)
[29] Plaintiff provides an expert declaration to support the argument that the speech recognition tools are not generic, off-the-shelf components, and "had to be interfaced and integrated into the system by the inventor with extensive software applications to operate in the manner described in the specification." (D.I. 13 at 16-17; D.I. 14)

20

The pre-emption inquiry focuses on whether the patent "would risk disproportionately tying up the use of the underlying ideas." *Alice*, 134 S.Ct. at 2354; *Mayo*, 132 S.Ct. at 1294. Plaintiff argues that the abstract idea of "managing business communications" is not broadly preempted as "[n]ot only is it possible to continue managing business communications using non-integrated, independent communication systems, but the requirements of 'speaker-independent' and 'natural' speech recognition accompanying the claims' system-unification limitations make preemption concerns in this field specious." (D.I. 13 at 18) Plaintiff's arguments, however, ignore the claim language. *See, e.g., Planet Bingo, LLC v. VKGS LLC*, 576 F. App'x 1005, 1008-09 (Fed. Cir. 2014) (rejecting the argument that unclaimed features and "complex computer code" are relevant for patent-eligibility purposes); *Accenture*, 728 F.3d at 1345 (stating that "the important inquiry for a § 101 analysis is to look to the claim."). In the case at bar, the claim language (informed by the specification) does not support plaintiff's characterization of the computer components as specialized. *buySAFE, Inc.*, 765 F.3d at 1355 (comparing the claims at issue to the computers in *Alice* and finding that the "computer functionality is generic" and "not even arguably inventive," when it "receives and sends the information over a network—with no further specification."). Indeed, the claims of the patents-in-suit do not reference any customization of the "compilation of hardware and software" described by the specification. *See, e.g., Accenture*, 728 F.3d at 1344-46 (finding that recitations of software components did not

However, "the complexity of the implementing software or the level of detail in the specification does not transform a claim reciting only an abstract concept into a patent-eligible system or method." *Accenture*, 728 F.3d at 1345.

21

confer patent eligibility to claims directed to the abstract concept of "generating tasks to be performed in an insurance organization").

Nor do the steps claimed provide sufficient specificity to negate the risk of preemption. Organizing business functions based on commands provided by a user is tantamount to the automation of the management of business communications usually performed by human administrative assistants (the identified purpose of the invention). At best, the claims describe using known technology (voice recognition, telephone or Internet) to enable the "subscriber" to manage a network system made up of known communications components (e.g., telephone, fax, and answering machine) and computer components (e.g., servers and computers).

As to the machine or transformation test, plaintiff avers that "the very purpose of unified messaging is the ability to transform a particular communication into a different state or communication," e.g., voicemails into text or faxes into e-mails or spoken voice. (D.I. 13 at 18) Plaintiff explains that "the purpose of natural speech recognition is to transform spoken words into a function to be executed, data to be stored, or a configuration to be set." (*Id.*) However, the patent does not claim the alleged transformations.

Given the options illustrated in the specification and the broad claim language, the "inventive concept" of the patents-in-suit does not pass muster under § 101. Even if the problem addressed were characterized as Internet-centric, the claimed solution is not described with enough specificity to place meaningful boundaries on the inventive concept.

## V. CONCLUSION

For the foregoing reasons, the court grants defendants' motions to dismiss.  An appropriate order shall issue.